## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTTHONY DESIGN ORIGINALS, INC. and ANTTHONY MARK HANKINS,** | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| **QVC GROUP, INC., HSN, INC., HSNi, LLC and DOES 1-10,** | : | |
| | : | Civil Action No. |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiffs, Antthony Design Originals, Inc. ("ADO") and Antthony Mark Hankins ("Hankins" and together collectively referred to as "Plaintiffs"), by and through their attorneys, Samuel B. Fineman, Esq. of Semanoff Ormsby Greenberg & Torchia, LLC, for their Complaint against Defendants, QVC Group, Inc., HSN, Inc., HSNi, LLC and Does 1-10 (hereafter collectively referred to as "QVC," "HSN" and "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.      This action arises from the abrupt and unjustified termination of a 31-year business relationship between Hankins, a renowned designer and founder of ADO, and Defendants QVC and HSN. The termination, which occurred without prior notice or allegations of contractual breach, reflects a pattern of discriminatory treatment, retaliatory conduct, and operational mismanagement by HSN and QVC.

2.      Hankins is a Savannah, Georgia-based, celebrated African American fashion designer, brand creator, and on-air style personality best known for his successful, ready-to-wear clothing lines and his long-running presence on shopping networks like HSN and related platforms. His fashion lines have been carried by major retailers like JCPenney, Target, Kmart, Nordstrom and

Sears. He works with multiple manufacturers, including CS Sportswear (Masayo Sasaki/Jennie Dong), AmieeLynn (Christina Le), and Jump Apparel (Ellen Kroll / Glenn Schlossberg). Named by *Newsweek* as one of the Top 100 People to Watch in America, Hankins has been featured in publications such as *Business Week* and *The Wall Street Journal* as a notable American fashion success story.

## JURISDICTION AND VENUE

3.     The original jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 because the parties have complete diversity of citizenship and the amount in controversy exceeds $75,000.

4.     This Court has personal jurisdiction over QVC/HSN in that they: a) maintain continuous and systematic affiliations with the Commonwealth of Pennsylvania; and b) purposely avail themselves of conducting activities within the Commonwealth.

5.     Specifically, QVC and more recently HSN (and its affiliates), now list their collective headquarters as 1200 Wilson Drive, West Chester, Pennsylvania 19380.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because QVC and HSN maintain their business headquarters in this judicial district.

## PARTIES

7.     Hankins is an adult individual residing and maintaining his fashion business in Savannah, Georgia.

8.     ADO maintains its corporate headquarters at 5501 Abercorn Street, Suite D #266, Savannah, Georgia 31405.

9.      Defendant QVC Group, Inc., is a publicly traded corporation, with a NASDAQ designation of QVCGA. Defendant QVC does business under the QVC and HSN service marks. At all times relevant to this action, Defendant QVC Group, Inc., was the parent corporation, owner and operator of both Defendant HSN, Inc. and Defendant HSNi, LLC.

10.     Historically, Defendant QVC originated as a Liberty Media-controlled asset, was housed within Liberty Interactive, later rebranded as Qurate Retail Group, and now operates as QVC Group, Inc. — a public company that remains subject to historical Liberty-affiliated control and governance influence.

11.     Defendant QVC is a Delaware corporation that maintains its corporate headquarters at 1200 Wilson Drive, West Chester, Pennsylvania 19380.

12.     Defendant HSN, Inc., is a Delaware corporation with its principal place of business in West Chester, Pennsylvania.

13.     Defendant HSNi, LLC, is a Delaware limited liability company with principal place of business in West Chester, Pennsylvania.

14.     Upon information and belief, and at all times relevant to this action, Defendant QVC Group, Inc., maintained operational control over Defendant HSN, Inc., and Defendant HSNi, LLC, maintained financial control over Defendant HSN, Inc. and Defendant HSNi, LLC, had a controlling ownership interest in Defendant HSN, Inc. and Defendant HSNi, LLC, and controlled significant functions of the business of Defendant HSN, Inc. and Defendant HSNi, LLC.

15.     Upon information and belief, and at all times relevant to this action, Defendant QVC Group, Inc. and Defendant HSNi, LLC acted directly in the interests of Defendant HSN, Inc., in relation to HSN's on-air talent and its contracts therewith.

16.     Defendants Does 1 through 10 are other individuals or entities who participated in and/or aided and abetted the actions described herein against ADO and Hankins. Plaintiffs are unaware of the true names or capacities of Does 1 through 10. Plaintiffs are informed and believe, and on that basis aver, that Does 1 through 10 either (a) directly performed the acts alleged herein, (b) were acting as the agents, principals, alter egos, employees, or representatives of the other Defendants, and/or (c) otherwise participated in the acts alleged herein with the other Defendants. Accordingly, Defendants Does 1 through 10 each are liable for all of the acts alleged herein because they were the cause in fact and proximate cause of all injuries suffered by Plaintiffs as alleged herein. Plaintiffs will amend the Complaint to state the true names of Defendants Does 1 through 10 when their identities are discovered.

**Contractual Relationship**

17.     On January 1, 2015, Plaintiff ADO and Defendant HSNi, LLC entered into a Marketing and Services Agreement governing the parties' business relationship. See Ex. "A."

18.     On November 29, 2022, the parties executed a Second Amendment to the Marketing and Services Agreement, effective August 31, 2022, which extended the term of the Agreement through August 31, 2024. See Ex. "B."

19.     The Second Amendment guaranteed Hankins a minimum of four (4) hours of on-air time per scheduled in-studio visit. See Ex. "B."

20.     The Second Amendment imposed liability on HSN for travel and accommodation costs if the guaranteed airtime commitments were not met. See Ex. "B."

21.     The Marketing and Services Agreement defined a "Sell-Off Period" as six months immediately following expiration or termination of the Agreement. See Ex. "A."

22.    The Agreement limited the license to use Hankins' name, photograph, likeness, and endorsement to the Term and Sell-Off Period only. See Ex. "A."

23.    The Agreement described the license to use Hankins' image and likeness as revocable in the case of HSN's uncured material breach. See Ex. "A."

24.    The Agreement required HSN to provide commercially reasonable promotion and marketing support, distribution and brand protections, and to meet minimum purchase order thresholds of $2,000,000 over any six-month period. See Ex. "A."

**Systematic Operational Suppression**

25.    Throughout 2023 through 2025, Plaintiffs experienced systematic operational suppression by Defendants.

26.    Defendants reduced Hankins' airtime, diminished promotional support, provided insufficient rack space, failed to ensure models appeared for shows, improperly styled garments and allowed hosts to refuse to wear Hankins' clothing on air.

27.    While Hankins was still on air, Defendants failed to maintain basic digital infrastructure: product images did not roll up properly on HSN.com, and key product pages were missing images or showing broken or incorrect images.

28.    These digital infrastructure failures undermined basic e-commerce functionality and sales opportunities.

29.    Defendants deliberately diverted resources, attention, and infrastructure away from legacy vendors like Hankins to build a TikTok-centered business model.

30.    Effective February 25, 2026, TikTok vendors were required to ship through designated logistics portals controlled by Defendants.

31.    Defendants showed no interest in renewing traditional vendor contracts with legacy vendors like Hankins, focusing instead on the new TikTok-focused business model.

32.    Defendants used Hankins' platform, audience, and 31-year history to set up their new business model while simultaneously pulling resources and support from him.

**Financial Harm and Revenue Suppression**

33.    In Calendar Year 2025, Plaintiffs' actual gross sales were $13.24 million versus projected sales of $15.67 million.

34.    This represented revenue suppression of approximately $2.43 million, or 15.5% below projections.

35.    Actual units sold were 349,103 versus projected units of 401,756, representing a shortfall of 52,653 units.

36.    When Defendants provided adequate support, Hankins' core apparel line outperformed projections by 27%, demonstrating that demand was not the limiting factor.

37.    In December 2025, sales collapsed by 75% versus projection with no disclosed justification from Defendants.

38.    The revenue shortfall was directly caused by Defendants' controlled operational decisions, including reduced airtime, diminished promotional support and unexplained withdrawal of support in Q4 2025.

**Breach of Guaranteed Airtime Commitments**

39.    On May 3, 2025, Hankins traveled to Tampa, Florida based on HSN's schedule for in-studio appearances.

40.    Upon his arrival in Tampa, Hankins learned that all May 3, 2025 shows had been cancelled and rescheduled for a later week.

41.    This cancellation occurred after Hankins had already incurred travel expenses and lost the opportunity to earn commissions during the scheduled weekend hours.

42.    Defendants failed to provide the guaranteed four hours of on-air time per in-studio visit on multiple occasions.

43.    Defendants failed to compensate Hankins for travel and accommodation costs when airtime guarantees were not met, as required by the Second Amendment.

**Premature Termination Without Cause**

44.    On July 29, 2025, Defendants sent Plaintiffs a termination notice stating that the Agreement would terminate effective August 31, 2025. See Ex. "C."

45.    The Second Amendment had extended the Agreement through August 31, 2024, meaning the termination occurred after the contractual term had already expired. See Ex. "B."

46.    HSN's president, Stacey Bowe, explicitly stated that the termination "was not based on a breach of contract." See Ex. "D."

47.    Plaintiffs were given fewer than two weeks' notice of termination after 31 years of successful business relationship. Specifically, the termination notice was emailed July 29, 2025, and although it states an effective date of August 31, 2025, HSN pulled Hankins off-air immediately on July 29, 2025, with Hankins having multiple August shows already scheduled (including the upcoming weekend). The scheduled/cancelled August 2025 shows were as follows:

- Sat 8/2/2025  -- (All Listed in the header erroneously for 2024)

- Sun 8/3/2025 – Antthony Design Original Fashions (two blocks)

- Mon 8/4/2025 – HSN Today with Friends

- Fri 8/15/2025 – HSN Today with Friends

- Tue 8/19/2025 – HSN Today with Friends

- Wed 8/20/2025 – Antthony Design Original Fashions (four blocks)

- Thu 8/21/2025 – Antthony Design Original Fashions (two blocks)

- Thu 8/28/2025 – HSN Today with Friends. Thus, operationally, Defendants were not provided two-weeks' notice.

48.    Hankins offered to support programming through year-end to ensure a smooth transition, but Defendants declined to meet with him.

49.    After termination, Defendants barred Hankins from appearing on air while continuing to air and promote his brand.

**Unauthorized Post-Termination Use of Image and Likeness**

50.    Following the August 31, 2025 termination, Defendants continued using Hankins' image, name, photograph and likeness in marketing emails and advertisements. See Ex. "E."

51.    As of January 22, 2026—nearly five months after termination—Defendants were still using Hankins' image and likeness in marketing materials. See Ex. "E."

52.    As of January 26, 2026, Defendants continued to use Hankins' image in marketing materials. See Ex. "E."

53.    This continued use extended more than seven months beyond the termination date, well beyond the contractually-permitted six-month Sell-Off Period.

54.    Defendants paired Hankins' image and name with massive retail price reductions and deep discounting in these marketing materials.

55.    This association with deep discounting eroded the perceived value of the Antthony brand and damaged the goodwill built over 31 years of trust, quality and consistency.

56.    The continued use of Hankins' image conveyed to customers an implied affiliation and approval of Defendants' promotional strategies, despite the termination of the relationship.

57.    This created customer confusion about Hankins' ongoing relationship with HSN and his endorsement of the deep discounting strategy.

58.    The deep markdowns paired with Hankins' name and image reset customer price expectations and eroded brand value.

59.    The customer confusion interfered with Hankins' ability to pursue future distribution opportunities and new business partnerships.

**False Statements Regarding Ownership**

60.    Following termination, multiple HSN insiders and hosts reported that Defendants' management made statements representing or implying that HSN or QVC had "bought" Hankins' company.

61.    These statements were made to hosts including Marlo Smith, Bobbi Ray Carter, and Lynne Murphy.

62.    These statements were made to guest services staff including John Camacho.

63.    These statements were made to vendors who worked with Plaintiffs.

64.    Some of these statements indicated that Defendants would continue the Antthony brand without Hankins.

65.    No sale of ADO or the Antthony brand to Defendants ever occurred.

66.    No agreement for Defendants to continue the brand without Hankins ever existed.

67.    On September 22, 2025, HSN's official Facebook page announced that Hankins would appear on air with multiple time slots, despite no contract being in place.

68.    These false statements damaged Plaintiffs' reputation, undermined their ability to negotiate new distribution deals, and diluted the goodwill and brand equity built over 31 years.

**Interference with Vendor Relationships**

69.    Plaintiffs had established long-term business relationships with multiple vendors, including CS Sportswear, Amiee Lynn, and Jump Apparel.

70.    CS Sportswear has worked with Hankins for 21 years and holds a master library of ADO's proprietary materials, including patterns, lab dips, costing cards, and related technical documentation.

71.    During the COVID-19 pandemic, Defendants unilaterally removed Hankins' proven manufacturing partners and assigned a third-party vendor without Hankins' input or consent.

72.    Defendants consistently delivered purchase orders late to Plaintiffs' vendors, compressing production timelines and severely compromising product quality.

73.    Defendants provided inconsistent communications to vendors about the continuation or termination of the Antthony brand, with some vendors being told the line was "on hold" while others were told it was cancelled.

74.    Defendants created confusion among vendors about ownership of Hankins' company by suggesting they had "bought" the company or would continue the brand without Hankins.

75.    As a result of Defendants' conduct, vendors CS Sportswear, AmieeLynn, and Jump Apparel suffered significant losses.

76.    In early September 2025, Hankins sent a formal intellectual property letter to CS Sportswear reiterating their contractual obligation to safeguard ADO's proprietary materials and requesting written confirmation that they would not disclose, sell, or transfer any such information without prior written consent. See Ex. "F."

77.    This letter was necessary due to concerns that Defendants may have threatened or attempted to access or use these proprietary materials.

## Unauthorized Third-Party Sales and Brand Protection Failures

78.    As early as May 30, 2018, Hankins discovered Antthony brand products listed on Amazon using HSN's proprietary images, item numbers, and descriptions.

79.    These unauthorized Amazon listings were sold by a seller identified as "Chel's Closes Closet."

80.    Hankins identified this seller as also operating on eBay with extensive inventory access to Antthony products.

81.    Hankins requested that HSN's legal team send a cease-and-desist letter to Amazon regarding the unauthorized use of HSN's images. See Ex "G."

82.    Hankins expressed concern that unauthorized third-party sales undervalued the brand and created customer confusion.

83.    Despite notification, Defendants took no effective action to stop the unauthorized sales.

84.    Products continued appearing on Amazon and eBay with HSN images and product numbers.

## Inventory Disposition and Liquidation

85.    Defendants engaged in bulk liquidation of merchandise through the B-Stock marketplace, selling pallets and truckloads of merchandise.

86.    This liquidation explains the disposition of inventory and created a paper trail including lot IDs, manifests, invoices, settlement statements and recovery reports.

87.    Despite the ongoing dispute, Defendants continued promoting Hankins' remaining styles in marketing emails, demonstrating the brand's commercial viability and Defendants' continued reliance on Hankins' brand equity.

**Discriminatory Treatment**

88.    Hankins is an African American designer who maintained a 31-year relationship with Defendants with no history of misconduct.

89.    Hankins was terminated with only two weeks' notice and immediately removed from on-air appearances.

90.    By contrast, Ken Downing, a non-minority male creative director and designer, reportedly acted inappropriately with HSN/QVC's president, screaming at the top of his lungs over garment steaming issues.

91.    Despite this conduct, Downing remained in good standing with Defendants and continued appearing on air.

92.    Hankins' brand received heavy programming exposure around Black History Month but comparatively limited support during the rest of the year.

93.    This pattern reinforced tokenistic inclusion rather than consistent, year-round support.

94.    In early 2023, Hankins anchored a major Black History Month event with strong sales performance.

95.    HSN leadership sent congratulatory emails about this event, with one Vice President and General Merchandise Manager writing it was an "INCREDIBLE day." See Ex. "H."

96.    Despite this demonstrated success and recognition, Defendants terminated the relationship in 2025.

97.    Moreover, in vendor videos and promotional podcasts, HSN centered on a fictional customer, "Nicole," whose interests became paramount for selling purposes.

98.    Hankins understood "Nicole" to be internal shorthand used by Defendants for Black women and women of color. See Ex. "I."

99.    This coded language suggested differential treatment based on race.

**Performance and Brand Viability**

100.    Throughout the 31-year relationship, Hankins' brand demonstrated strong commercial viability and customer loyalty.

101.    When provided with adequate support, Hankins' core apparel line outperformed sales projections by 27%.

102.    Defendants' own leadership recognized the brand's success, as evidenced by the congratulatory emails following the successful Black History Month event.

103.    The brand's viability is further demonstrated by Defendants' continued promotion of Hankins' products even after termination and during the dispute.

**CLAIMS FOR RELIEF**

**Count I - Breach of Contract**
**(against all defendants)**

104.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 103 as if fully set forth herein.

105.    A valid and enforceable contract existed between Plaintiffs and Defendants.

106.    The Marketing and Services Agreement dated January 1, 2015, as amended by the Second Amendment dated November 29, 2022 (effective August 31, 2022), constituted a valid

and enforceable contract between ADO and HSNi, LLC, extending the term through August 31, 2024.

107.    Plaintiffs performed all contractual obligations under the Agreement.

108.    Plaintiffs designed products, made scheduled appearances, promoted the brand and fulfilled all requirements under the Marketing and Services Agreement and its amendments.

109.    Defendants breached the contract.

110.    Defendants failed to provide the guaranteed four hours of on-air time for scheduled in-studio visits as required by the Second Amendment, including the May 3, 2025 Tampa visit where all shows were cancelled after Hankins had already traveled to the location.

111.    Defendants failed to provide commercially reasonable promotion and marketing support as required by Section 2 of the Agreement, as evidenced by reduced airtime, diminished promotional support, insufficient rack space, models failing to appear, improper styling and hosts refusing to wear Hankins' clothing.

112.    Defendants failed to provide distribution and brand protections as required by Section 4(c) of the Agreement, as evidenced by unauthorized third-party sales on Amazon and eBay using HSN's proprietary images dating back to at least May 2018, and Defendants' failure to take effective action despite notification.

113.    Defendants failed to meet the $2,000,000 minimum purchase order threshold over six-month periods as required by Section 6(e) of the Agreement.

114.    Defendants failed to compensate Plaintiffs for travel and accommodation costs when airtime guarantees were not met, as required by the Second Amendment.

115.    Defendants continued using Hankins' name, photograph, likeness, and endorsement in marketing materials for more than seven months after termination, exceeding the contractually-permitted six-month Sell-Off Period.

116.    Defendants' breaches caused damages to Plaintiffs.

117.    As a direct result of Defendants' breaches, Plaintiffs suffered considerable lost profits of $2.43 million in revenue suppression during Calendar Year 2025 alone.

118.    Plaintiffs lost commission revenue calculated at contractual rates of 8-9% in suppressed revenue and significant lost commissions.

119.    Plaintiffs suffered a shortfall of tens of thousands of units not sold due to Defendants' failure to provide adequate promotional support and airtime.

120.    Plaintiffs incurred unreimbursed travel and accommodation costs, including costs for the cancelled May 3, 2025 Tampa trip.

121.    Plaintiffs suffered damage to brand equity and goodwill built over 31 years due to association with deep discounting and unauthorized use of Hankins' image.

122.    Plaintiffs suffered loss of market opportunity and diminished brand momentum due to exclusive channel restrictions that prevented mitigation of losses through alternative sales platforms while Defendants simultaneously underperformed their promotional obligations.

### Count II - Breach of the Implied Covenant of Good Faith and Fair Dealing
### (against all defendants)

123.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 122 as if fully set forth herein.

124.    A valid contract existed between Plaintiffs and Defendants.

125.    The Marketing and Services Agreement dated January 1, 2015, as amended, constituted a valid contract between the parties.

126.    Defendants engaged in conduct that evaded the spirit of the contract, willfully rendered imperfect performance or interfered with Plaintiffs' performance.

127.    Defendants manipulated show schedules and reduced airtime for Hankins' appearances, contrary to the spirit and purpose of the Agreement, including cancelling all May 3, 2025 shows after Hankins had already traveled to Tampa.

128.    Defendants provided inadequate support for on-air presentations, including failing to properly prepare models and hosts, failing to steam garments before shows and allowing hosts to refuse to wear Hankins' clothing on air.

129.    Defendants deliberately suppressed airtime, promotional support and digital infrastructure while redirecting resources to a new TikTok-focused business model.

130.    Defendants failed to maintain basic e-commerce functionality, with product images not rolling up properly on HSN.com and key product pages missing images or showing broken or incorrect images.

131.    Defendants made false claims about "buying" Hankins' company to hosts, staff, and vendors, undermining Hankins' ownership and control of his brand.

132.    Defendants terminated the 31-year relationship without cause, with HSN's president explicitly stating the termination "was not based on a breach of contract," and refused to meet with Hankins to discuss the termination despite his offer to support programming through year-end.

133.    Defendants continued using Hankins' image and likeness in marketing materials well beyond the contractually-permitted six-month Sell-Off Period, pairing his image with deep discounting that eroded brand value.

134.    Defendants' conduct was not justified or privileged.

135.    Defendants admitted the termination was not based on any breach of contract by Plaintiffs.

136.    Defendants had no legitimate business justification for the systematic operational suppression, resource diversion and post-termination misuse of Hankins' image and likeness.

137.    Defendants' breaches caused damages to Plaintiffs.

138.    As a direct result of Defendants' breaches, Plaintiffs suffered significant lost profits based upon revenue suppression.

139.    Plaintiffs suffered damage to brand and reputation through association with deep discounting and false statements about ownership.

140.    Plaintiffs' vendors suffered major losses, damaging Plaintiffs' relationships with these vendors and ability to conduct business with them in the future.

141.    Plaintiffs suffered emotional distress resulting from the abrupt termination of the 31-year relationship without cause, discriminatory treatment, and reputational harm.

### Count III - Tortious Interference with Business Relations
### (against all defendants)

142.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 141 as if fully set forth herein.

143.    Valid contractual and prospective contractual relationships existed between Plaintiffs and third parties.

144.    Plaintiffs had established business relationships with vendors including CS Sportswear (21-year relationship), Amiee Lynn, and Jump Apparel.

145.    Plaintiffs had prospective business relationships with potential new distribution partners and retailers.

146.    Defendants had knowledge of these relationships.

147.    Defendants were aware of Plaintiffs' vendor relationships, as these vendors manufactured products sold through Defendants' platforms.

148.    Defendants were aware that Plaintiffs would need to establish new distribution relationships following termination of the parties' agreement.

149.    Defendants engaged in intentional and improper conduct designed to interfere with these relationships.

150.    During the COVID-19 pandemic, Defendants unilaterally removed Hankins' proven manufacturing partners and assigned a third-party vendor without Hankins' input or consent.

151.    Defendants consistently delivered purchase orders late to Plaintiffs' vendors, compressing production timelines and severely compromising product quality.

152.    Defendants provided inconsistent communications to vendors about the continuation or termination of the Antthony brand, with some vendors being told the line was "on hold" while others were told it was cancelled.

153.    Defendants created confusion about ownership of Hankins' company by suggesting to vendors and others that they had "bought" the company or would continue the brand without Hankins.

154.    Defendants terminated the relationship with Hankins without cause, thereby severing the vendor relationships that depended on Hankins' involvement with Defendants' platform.

155.   Defendants' continued use of Hankins' image and likeness beyond the Sell-Off Period, paired with deep discounting, created customer confusion that interfered with Hankins' ability to pursue new distribution opportunities.

156.   Defendants' false statements that they had "bought" Hankins' company damaged his reputation and undermined his ability to negotiate new distribution deals.

157.   Defendants' conduct caused actual harm to Plaintiffs' business relationships.

158.   As a direct result of Defendants' interference, Plaintiffs' vendors suffered considerable losses.

159.   These vendor losses damaged Plaintiffs' relationships with CS Sportswear, Amiee Lynn, and Jump Apparel, and harmed Plaintiffs' ability to conduct business with them in the future.

160.   The customer confusion created by Defendants' unauthorized use of Hankins' image interfered with Plaintiffs' ability to pursue future distribution opportunities and new partnerships.

161.   Defendants had no legitimate business justification for their interference.

162.   Defendants admitted the termination was not based on any breach of contract by Plaintiffs.

163.   Defendants had no legitimate reason to make false statements about purchasing Plaintiffs' company or to use Plaintiffs' image beyond the contractually-permitted Sell-Off Period.

**Count IV - Defamation**
**(against all defendants)**

164.       Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 163 as if fully set forth herein.

165.   Defendants made false statements of fact concerning Plaintiffs.

166.    Defendants made statements that they had "bought" Hankins' company or would continue the Antthony brand without him.

167.    No sale of ADO or the Antthony brand to Defendants ever occurred, and no agreement for Defendants to continue the brand without Hankins ever existed.

168.    Defendants published these false statements to third parties.

169.    Defendants made these false statements to hosts including Marlo Smith, Bobbi Ray Carter and Lynne Murphy.

170.    Defendants made these false statements to guest services staff including John Camacho.

171.    Defendants made these false statements to vendors who worked with Plaintiffs.

172.    On September 22, 2025, HSN's official Facebook page publicly announced that Hankins would appear on air with multiple time slots, despite no contract being in place.

173.    The false statements applied to Plaintiffs.

174.    The statements specifically concerned Plaintiffs' ownership of their company and brand, and Plaintiffs' ongoing relationship with Defendants.

175.    Recipients understood the defamatory meaning of the statements.

176.    Recipients understood the statements to mean that Plaintiffs had sold their company to Defendants or had willingly exited the relationship, which was false.

177.    Recipients understood that the statements were intended to apply to Plaintiffs and ADO.

178.    The false statements caused special harm to Plaintiffs.

179.    The false statements damaged Plaintiffs' reputation in the fashion industry and among business partners.

180.    The false statements undermined Plaintiffs' ability to negotiate new distribution deals with potential partners who believed Defendants owned the Antthony brand.

181.    The false statements diluted the goodwill and brand equity Plaintiffs built over 31 years.

182.    The Facebook announcement falsely implied an ongoing relationship and Hankins' endorsement of HSN's conduct, causing customer confusion and reputational harm.

### Count V - Misappropriation of Trade Secrets
### (against all defendants)

183.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 182 as if fully set forth herein.

184.    Plaintiffs possessed trade secrets.

185.    Plaintiffs possessed proprietary materials including patterns, lab dips, costing cards and other technical documentation developed over decades of design work.

186.    These materials derive independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

187.    CS Sportswear holds a 21-year master library of ADO's proprietary materials pursuant to the parties' business relationship.

188.    Plaintiffs took reasonable measures to maintain the secrecy of these trade secrets.

189.    The proprietary materials were communicated to Defendants and to vendors like CS Sportswear pursuant to confidential business relationships and contractual obligations to safeguard the information.

190.    In early September 2025, Hankins sent a formal intellectual property letter to CS Sportswear reiterating their contractual obligation to safeguard ADO's proprietary materials and requesting written confirmation that they would not disclose, sell or transfer any such information without prior written consent.

191.    Defendants used or threatened to use Plaintiffs' trade secrets in violation of the confidential relationship.

192.    Defendants suggested they would continue producing Hankins' line without him, implying use of his proprietary designs and materials.

193.    Defendants made statements to vendors and others that they had "bought" Hankins' company or would continue the brand without him, creating risk of unauthorized disclosure or use of proprietary materials.

194.    The necessity of Hankins' September 2025 intellectual property letter indicates Hankins' concern that Defendants may have threatened or attempted to access or use the proprietary materials held by CS Sportswear.

195.    Defendants' use or threatened use of the trade secrets caused harm to Plaintiffs.

196.    Plaintiffs suffered considerable lost profits based upon revenue suppression.

197.    Plaintiffs suffered damage to brand and reputation.

198.    Plaintiffs suffered diminution of the value of their intellectual property due to the risk of unauthorized disclosure or use.

**Count VI - Discrimination in Violation of 42 USCS § 1981**
**(against all defendants)**

199.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 198 as if fully set forth herein.

200.    Plaintiff Hankins is a member of a racial minority.

201.    Hankins is an African American fashion designer.

202.    Defendants intended to discriminate against Hankins on the basis of race.

203.    Hankins, a Black designer with 31 years of service and no history of misconduct, was terminated without cause after only two weeks' notice and immediately removed from on-air appearances.

204.    By contrast, Ken Downing, a non-minority male creative director and designer, reportedly acted highly inappropriately with HSN/QVC's president, screaming at the top of his lungs over garment steaming issues, yet remained in good standing and continued appearing on air.

205.    Hankins' brand received heavy programming exposure around Black History Month but comparatively limited support during the rest of the year, reinforcing a pattern of tokenistic inclusion rather than consistent, year-round support.

206.    An internal email from a broadcast scheduling manager stated, "As an advocate for Nicole we need to always showcase what the product is doing," with Hankins understanding "Nicole" to be internal shorthand for Black women and women of color, suggesting differential treatment based on race.

207.    Despite Hankins anchoring a successful Black History Month event in early 2023 that HSN leadership praised as "INCREDIBLE," and despite his 31-year track record, Defendants terminated the relationship without cause and refused to meet with him.

208.    The discrimination concerned Hankins' right to make and enforce contracts.

209.    The discrimination directly affected Hankins' right to make and enforce the Marketing and Services Agreement, including its performance, modification, and termination, as protected by 42 USCS § 1981.

210.    Hankins suffered injury as a result of the discrimination.

211.    As a direct result of the discrimination, Hankins suffered siginifcant lost profits based upon revenue suppression.

212.    Hankins suffered significant lost commission revenue based on Defendants' conduct.

213.    Hankins suffered damage to his reputation and emotional distress.

214.    Defendants' discriminatory conduct was a substantial or motivating factor in Hankins' injury.

215.    The differential treatment between Hankins and non-minority designers like Ken Downing, the tokenistic programming patterns, the use of coded language and the abrupt termination without cause despite proven success demonstrate that race was a substantial or motivating factor in Defendants' conduct.

### Count VII - Unjust Enrichment
### (against all defendants)

216.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 215 as if fully set forth herein.

217.    Plaintiffs conferred substantial benefits on Defendants.

218.    Plaintiffs conferred 31 years of brand development, customer goodwill, proprietary designs and intellectual property on Defendants.

219.    Plaintiffs built a loyal customer base and strong brand recognition through consistent quality and Hankins' personal reputation as a celebrated designer.

220.    Defendants appreciated these benefits.

221.    Defendants' continued use of Plaintiffs' brand after termination demonstrates their appreciation of the brand's value.

222.    Defendants' strong sales of Plaintiffs' products over the 31-year relationship, including the "INCREDIBLE" Black History Month event in early 2023, demonstrates their appreciation of the benefits.

223.    Defendants' continued marketing of Plaintiffs' brand in mailers and advertisements, even during the dispute, demonstrates their continued reliance on the brand's value.

224.    Defendants' retention of these benefits without proper compensation would be inequitable.

225.    Defendants prematurely terminated the contract without cause, with their president explicitly stating the termination "was not based on a breach of contract."

226.    Defendants attempted to continue the brand without Plaintiffs through false statements that they had "bought" the company.

227.    Defendants continued using Plaintiffs' image and likeness in marketing materials well beyond the contractually-permitted six-month Sell-Off Period.

228.    Defendants have retained the goodwill, brand equity, customer relationships and intellectual property developed by Plaintiffs over 31 years without providing adequate compensation.

229.    Defendants systematically suppressed Plaintiffs' revenue through reduced airtime and promotional support while simultaneously benefiting from the brand equity Plaintiffs had built.

**Count VIII - Violation of Right of Publicity / Misappropriation of Name and Likeness
(against all defendants)**

230.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 229 as if fully set forth herein.

231.    Plaintiff Hankins has a protectable interest in his name, likeness and image.

232.    Hankins' name, likeness, and image are core assets of his personal brand, developed over 31 years of public prominence as a celebrated fashion designer.

233.    Hankins was named by Newsweek as one of the Top 100 People to Watch in America and has been featured in Business Week and The Wall Street Journal.

234.    Defendants used Hankins' name, likeness, and image without authorization.

235.    Following the August 31, 2025 termination, Defendants continued using Hankins' image, name, photograph and likeness in marketing emails and advertisements.

236.    As of January 22, 2026—nearly five months after termination—Defendants were still using Hankins' image and likeness in marketing materials.

237.    As of January 26, 2026, Defendants continued to use Hankins' image in marketing materials.

238.    This continued use extended more than seven months beyond the termination date, well beyond the contractually-permitted six-month Sell-Off Period that expired on February 28, 2026.

239.    The use was for commercial purposes.

240.    Defendants used Hankins' name, likeness and image to promote and sell Antthony brand products through marketing emails and advertisements.

241.    Defendants paired Hankins' image and name with massive retail price reductions and deep discounting to drive sales.

242.    The use caused injury to Plaintiff Hankins.

243.    The continued use created customer confusion about Hankins' ongoing affiliation with HSN and his endorsement of the promotional strategy.

244.    The association with deep discounting eroded the perceived value of Hankins' brand and damaged the goodwill built over 31 years of trust, quality, and consistency.

245.    The deep markdowns paired with Hankins' name and image reset customer price expectations, diminishing the brand's perceived value.

246.    The unauthorized use damaged Hankins' reputation and goodwill in the fashion industry.

247.    The customer confusion interfered with Hankins' ability to pursue future distribution opportunities and new partnerships.

248.    Defendants' use of Hankins' image was a substantial factor in causing this injury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

A.    Compensatory damages against all Defendants in an amount not less than $30,000,000, including but not limited to lost profits, lost commission revenue, vendor losses, brand suppression and opportunity loss, brand dilution and erosion, reputational harm, reliance and out-of-pocket costs, intellectual property diminution and emotional distress.

B.    Punitive damages against all Defendants in an amount to be determined at trial, sufficient to punish Defendants for their willful, wanton, and malicious conduct and to deter similar conduct in the future.

C.    Post-judgment interest against all Defendants pursuant to 28 USCS § 1961.

D.    A permanent injunction pursuant to USCS Fed. Rule Civ. Pro  65 against all Defendants prohibiting them from:

1.    Using Hankins' name, image, likeness, photograph, or endorsement in any marketing materials, advertisements or promotional content;

2.    Making any statements suggesting that Defendants purchased, own or control Antthony Design Originals, Inc. or the Antthony brand;

3.    Using, disclosing, or transferring any of Plaintiffs' proprietary materials, including patterns, lab dips, costing cards and technical documentation;

4.    Interfering with Plaintiffs' business relationships with vendors, distributors or potential business partners.

E.    A declaratory judgment pursuant to 28 USCS § 2201 that:

1.    Defendants breached the Marketing and Services Agreement and its amendments;

2.    Defendants' use of Hankins' image and likeness beyond the six-month Sell-Off Period was unauthorized and unlawful;

3.    Plaintiffs retain all ownership rights to Antthony Design Originals, Inc. and the Antthony brand;

4.    Defendants have no right to use Plaintiffs' proprietary materials or intellectual property.

5.    Attorney fees and costs of suit.

6.    Such other and further relief as the Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

SEMANOFF ORMSBY GREENBERG & TORCHIA, LLC
*/s/Samuel B. Fineman*
Samuel B. Fineman, Esq.
PA ID No. 75717
2617 Huntingdon Pike
Huntingdon Valley, PA 19006
(215) 887-0200 – tel.
sfineman@sogtlaw.com
Counsel for Plaintiffs, Antthony Design Originals, Inc. and
Antthony Mark Hankins

Dated: February 11, 2026

28